IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| SHAUN AUSTIN | : | CIVIL ACTION |
| | : | NO.  11-2847 |
| v. | : | |
| | : | |
| LEON HILL, et. al. | : | |

O'NEILL, J.                                                         April 8, 2014


## MEMORANDUM

      Plaintiff Shaun Austin has sued defendants Northampton County, Correctional Officer Leon Hill, Correctional Officer Jamie Brannon and Lieutenant Joseph Kospiah pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights.  Presently before me is defendants' motion for summary judgment and plaintiff's response thereto.  For the following reasons I will grant defendants' motion in part and deny defendants' motion in part.

## BACKGROUND

      Plaintiff contends that defendants Brannon, Hill and Kospiah violated his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by another inmate while he was incarcerated at Northampton County Prison.  Dkt. No. 23 at 12-14.  Plaintiff also asserts municipal liability, alleging that Northampton County adopted and maintained various policies, customs and practices that caused plaintiff's injuries.  Id. at 13-14.  Plaintiff also asserts several Pennsylvania state law claims based on the same incident.  Id. at 17-18.

      Austin was an inmate at Northampton County Prison on May 3, 2009 when he was

assaulted by inmate Eugenio Torres.[1]  Dkt. No. 35 at 2.  Both inmates were housed on L Tier at

NCP, Torres because he was housed in the administrative custody unit and Austin because he

was housed in the protective custody unit.  Dkt. No. 23 at 17-27; Dkt. No. 34 at 3.  Inmates

housed on L Tier share common areas for meals and recreation unless they are designated to

have separate out-of-cell time.  Dkt. No. 34 (Buskirk Dep.) at 49:1-18 ("two enemies [ ] on the

same housing unit, then [prison officials] would, obviously, not leave them out at the same

time"); see id. (Buskirk Dep.) at 103:7-18 (explaining that unless locked in their cells, Torres and

Austin accessed the same common area).  Austin and Torres were not classified as "keep

separates" until after the attack and therefore did not have separate out of cell time.[2]  Id. at

122:9-125:6.  Though the parties disagree on several issues of fact, including Torres's

motivation for attacking Austin and the extent to which defendant officers were aware Austin

was at risk, they do agree on several of the circumstances leading up to Austin's attack.

The undisputed facts show that the day before Austin was attacked there was an unrelated

fight on L Tier, after which Austin reported to defendants Officer Brannon and Lieutenant

Kospiah that Torres was involved.  Dkt. No. 35 at 5.  Because Austin's accusation was

uncorroborated Officer Brannon took no action against Torres. Dkt. No. 35-2 (Brannon Dep.) at

32:15-19; 41:12-16.  Approximately thirty minutes after Austin made his report, after obtaining

defendant Brannon's permission, Torres and another inmate distributed clean laundry to inmates

on L Tier under Officer Brannon's supervision.  Dkt. No. 35 at 6.  When Austin received his

---

[1]     Though Austin is currently a sentenced inmate he was a pretrial detainee on the date he
was attacked.  Dkt. No. 35 at 12.

[2]     There is a formal NCP policy for keeping certain inmates on the same tier apart from
each other by preventing them from being allowed out of their cells at the same time.  See Dkt.
No. 34 (Buskirk Dep) at 49:1-18.  In deposition testimony Brannon explained that when two
inmates are classified as "keep separates" they would never come into contact with each other
and would generally never even see each other.  Dkt. No. 35-2 (Brannon Dep.) at 122:12-24.

laundry he noted that it was "stained yellow and [smelled] bad" and was "wet at certain spots." Dkt. No. 35-1 (Austin Dep.) at 24:18-20.  Austin claimed that Torres and the other inmate urinated on his laundry "based on them being told that I had snitched on inmate Torres."  Id. at 54:15-17.  Brannon "indicated that he had been supervising [Torres and the other inmate] the whole time, and they did not urinate on [Austin's] laundry."  Id. at 28:14-16.  Austin reported his version of these events to defendant Hill and stated that he felt threatened.  Dkt. No. 35-2 (Austin Aff.) at ¶ 6-8.  In response Hill called the inmate classification department and left a message inquiring about having Torres moved.  Dkt. No. 35-1 (Austin Dep.) at 34:10-20; 35:22-25.

The following day, May 3, 2009, while plaintiff was engaged in a card game in the common area of L Tier, inmate Torres and several of his friends approached Austin and initiated an altercation.  Dkt. No. 35 at 8.  Brannon dispersed the group.  Id. at 8.  Approximately five minutes later Torres approached Austin from behind, put him into a headlock and cut into his face, head and neck with a razor blade taken from a prison-issued disposable razor.  Dkt. No. 35-1 (Austin Dep.) at 44:10-21.  This attack resulted in a serious wound that required many stitches to close.  Id. at 47:2-4.

Austin's version of these events includes several additional facts.  He contends that on May 2 after he reported to Brannon that inmate Torres was involved in the fight on L Tier that another inmate on L Tier "began shouting out to [i]nmate Torres that [p]laintiff had snitched on him."  Dkt. No. 35-1 (Austin Dep.) at 27:8-14.  Austin asserts that shortly after the fight, while Brannon was supervising Torres passing out the laundry, Torres "made threatening comments" to him.  Id. at 31:21-22.  Austin states that he reported these events to Brannon.  Id. at 27:22-28:16, 62:16-19.  Austin further contends that later that afternoon Brannon allowed Torres to use the telephone directly across from Austin's cell.  Id. at 32:2-18.  Austin overheard Torres'

conversation and asserts that Torres loudly declared his intention to stab Austin.  Id. at 31:22-32:16.  Austin states that defendant Hill also overheard Torres's comments on the telephone and noted that "there [was] obviously a problem between [Austin and Torres].  Id. at 33:5-18.  Austin states that he specifically reported to Hill that Torres "was targeting him for snitching about the fight, had threatened to stab him, and had already urinated on [p]laintiff's laundry."  Dkt. No. 35 at 7.  Finally, Austin contends that "during the initial altercation at the card table on May 3rd, one of the members of Torres's group grabbed him by the back of the neck and pushed his head down into the table top, and that defendant Brannon instructed Torres's group not to 'put hands' on plaintiff."  Dkt. No. 35-1 (Austin Dep.) at 41:25-43:24.

Though Austin contends that he was attacked because Torres regarded him as a snitch there is also evidence that Torres attacked Austin because Austin was charged with sex crimes against children.  Dkt. No. 34 at 69.  In the incident report that Officer Fuls completed immediately after the attack, Fuls wrote that Torres stated that he attacked Austin because Austin was "constantly talking about his case that he was having sex with little girls and giving them HIV."  Dkt. No. 34 at 69.  Fuls reported that Torres stated that "he had enough" and attacked Austin with four razor blades.  Id. at 69.  The incident report also includes Torres' alleged statement that "he is already serving life in prison and possibly the death penalty so 'why not[?] I don't give a fuck.'"  Id. at 69.  Additionally, in deposition testimony Lieutenant Richard Botteri stated that Torres "spontaneously" confessed that he attacked Austin because "[Torres] had a problem with Mr. Austin due to the nature of Mr. Austin's charges . . ."  Dkt. No. 35-3 (Botteri Dep.) at 16:10-24.  Botteri also authored a report after the attack in which he stated that he did not interrogate Torres but that Torres "freely stated" that "I cut him (Austin) because I have a

problem with him."[3]  Dkt. No. 34 at 66; <u>see also</u>, <u>id.</u> at 80 (the investigator for the Northampton

County Department of Corrections authored an affidavit of probable cause for the criminal

complaint against Torres regarding this incident and quoted Botteri's statement that Torres

"freely admitted" to Botteri that Torres cut Austin because Austin "bothered him and [Torres]

had a problem with [Austin].")

Defendants Hill, Brannon and Kospiah contend that they are entitled to summary

judgment of plaintiff's claims because they did not have notice that Austin was at risk of a

physical attack by inmate Torres and that they were not deliberately indifferent to Austin's safety

or well-being.  Dkt. No. 34 at 4.  Brannon's deposition testimony does not address whether, as

Austin claims, other inmates yelled out to Torres that Austin was a snitch and had implicated

Torres to Brannon.  Brannon also denies that Torres made the telephone call in which Austin

alleges that Torres loudly threatened to harm him.  Dkt. No. 35-2 (Brannon Dep.) at 72:2-8.

Additionally, in Hill's deposition testimony Hill denies that this telephone call occurred in his

presence.  Dkt. No. 35-2 (Hill Dep.) at 74:3-13.  Brannon and Hill contend that Austin merely

articulated a general complaint about Torres and did not provide notification that he was fearful

of physical violence.  Dkt. No. 34 at 19.  The individual defendants also assert that they are

entitled to qualified immunity.  <u>Id.</u> at 23-25.

Defendant Northampton County seeks summary judgment of plaintiff's <u>Monell</u> claim,

---

[3]      In deposition testimony Botteri also stated the following:

> I made another statement at that time asking [NCP investigator]
> Mr. Naugle if he wanted further documentation because Mr. Torres
> had also admitted to me that he had slashed Austin because of what
> he had done to those girls.  But Mr. Naugle felt they had enough
> criminal activity to proceed with prosecution without that.  So I did
> not submit that documentation.

Dkt. No. 35-3 (Botteri Dep.) at 36:16-23.

arguing that there is no evidence of a policy, custom or practice that caused Austin's injuries.  Id. at 25-32.  Additionally, defendants seek summary judgment of plaintiff's various state law claims.  Dkt. No. 34 at 33-39.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  A fact is "material" if it might affect the outcome of the case under governing law. Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on

unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W.

Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact

should be ascertained by resolving all inferences, doubts and issues of credibility against" the

movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation

marks omitted).

**DISCUSSION**

I.      **Failure to Protect**

        In order to prevail on his § 1983 claims Austin must demonstrate that defendants

deprived him of a right secured by the U.S. Constitution and that the deprivation was caused by a

person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  Since

defendants do not dispute that they were acting under color of state law I must only determine

whether they caused plaintiff to suffer violations of his constitutional rights.

        "The Eighth Amendment imposes a duty upon prison officials to take reasonable

measures to 'protect prisoners from violence at the hands of other prisoners.'"  Hamilton v.

Leavy, 117 F. 3d. 742, 746 (3d Cir. 1997), quoting Farmer v. Brennan, 511 U.S. 825, 833

(1994).  However, "not every injury suffered by one prisoner at the hands of another . . .

translates into constitutional liability for prison officials responsible for the victim's safety."

Farmer, 511 U.S. at 834.  In order to survive summary judgment on a failure to protect claim

plaintiff must satisfy three elements: first, that "he is incarcerated under conditions posing a

substantial risk of serious harm," second that the prison officials involved had a "sufficiently

culpable state of mind" and third that defendants' deliberate indifference caused the harm.

Farmer 511 U.S. 825 at 834; Hamilton, 117 F. 3d. at 746

When, as here, a plaintiff is a pretrial detainee rather than a convicted inmate he must seek relief under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment.  See e.g., Faulcon v. City of Phila., 18 F. Supp. 2d 537, 540 (E.D. Pa. 1998).[4]  Courts have repeatedly found that the rights to which pretrial detainees are entitled pursuant to the Fourteenth Amendment are at least as great as those afforded to inmates by the Eighth Amendment.  See e.g. Simmons v. City of Phila., 947 F.2d 1042, 1067 (3d. Cir. 1991). Therefore, the same deliberate indifference standard applies.  See e.g., Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012); Paulino v. Burlington Cnty. Jail, 438 F. App'x 106, 109 (3d Cir. 2011). "Where the injury experienced by a detainee is at the hands of another prisoner, § 1983 liability may be imposed on prison officials 'if there was intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard on the part of prison officials.'" Eichelman v. Lancaster Cnty., 510 F.Supp.2d 377, 389 (2007).

The Court of Appeals has determined that deliberate indifference requires a showing that the official knows the inmate faces a substantial risk of harm and disregards that risk.  See Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001).  Because deliberate indifference is a subjective standard "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  Id. at 125.  Austin may prove defendants' actual knowledge of a substantial risk of harm by direct or circumstantial evidence and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious."  Farmer, 511 U.S. 825 at 842.  Importantly, however, prison officials who respond reasonably under the

---

[4]     In a substantive due process challenge, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  County. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998).  A prison official's deliberate indifference to a substantial risk of harm to a pretrial detainee sufficiently shocks the conscience for a claim under the Substantive Due Process clause.  Id. at 834; Ziccardi v. City of Phila., 288 F. 3d 57, 64 (3d Cir. 2002).

circumstances will not be found liable for failure to protect, even when they had actual

knowledge of a substantial risk of harm.  Bistrian v. Levi, 696 F.3d 352, 367-68 (3d Cir. 2012).

Austin's placement in a protective custody unit does not automatically satisfy defendants'

duty to protect him from violence at the hands of other prisoners if defendants were deliberately

indifferent to a substantial risk of harm to plaintiff within that housing unit.  Id. at 368.

Therefore, I must evaluate whether each officer had subjective knowledge of such a risk to

Austin on L Tier.

Austin has presented evidence that raises a question of material fact as to whether

defendant Brannon was subjectively aware of a substantial risk of serious harm to Austin and

that disregarding that risk caused Austin's injuries.  Austin contends that he was attacked by

Torres because he "snitched" on Torres to officer Brannon.  Dkt. No. 35-1 (Austin Dep.) at

31:3-4.  Additionally, Austin contends that Brannon was present when another inmate yelled out

to Torres that Austin was a snitch.  Id. at 27:8-21.  This evidence creates a material question of

fact as to whether Brannon was on notice that Torres regarded Austin as a snitch.  If Brannon did

have such subjective knowledge, his subsequent conduct of allowing Torres out of his cell in

order to access Austin's clean laundry and deliver it to Ausin's cell may have been unreasonable.

Austin also contends that he reported to Brannon that Torres had made threatening comments to

him when returning his laundry and that his laundry was damp and smelled of urine.[5]  Id. at

27:25-28:16.  A reasonable jury could conclude that Torres urinated on Austin's laundry as an

act of retribution and may consider it evidence of an escalating risk to Austin.  Also recognizing

---

[5]     Defendants point out that it is unclear from the record whether Austin successfully
articulated notice to Brannon of the substantial risk of harm he faced.  Dkt. No. 36 at 4.  Because
I may conclude that prison official defendants had the requisite subjective knowledge from direct
and circumstantial evidence, I find that even if assuming arguendo Austin failed to properly
provide notice to Brannon I need not conclude that Brannon lacked subjective knowledge of that
risk.

the perception that Torres was held in administrative custody because he was already regarded as "gang affiliated" and "unpredictable," Dkt. No. 35-3 (Kospiah Dep.) at 32:15-24; 39:17-21, and prisoners' general attitude about "snitches," <u>Bistrian</u>, 696 F.3d 352 at 371, I find that Austin has demonstrated that material issues of fact exist as to whether Brannon was subjectively aware of a substantial risk of harm to Austin and whether his conduct caused Austin's injuries. Therefore, I will deny defendants' motion for summary judgment to the extent that it pertains to Brannon.

Austin also has presented evidence that defendant Hill overheard Torres loudly make threatening statements about Austin into the telephone and that Officer Hill observed that there was "obviously a problem between the two of [them]." <u>Id.</u> at 31:22-33:24. Additionally, Austin contends that he reported to Hill that Torres made threatening comments to him, that Torres urinated on his clean laundry and that Austin feared for his safety. <u>Id.</u> at 33:5-35:13. Officer Hill's only response was to leave a voicemail that he knew would not be received for at least 43 hours. <u>Id.</u> at 35:20-36:25; <u>see also</u> Dkt. No. 35-3 (Buskirk Dep.) at 49:22-51:1. A reasonable jury could conclude from this evidence that, like Brannon, Hill had actual knowledge that Torres perceived Austin to be a snitch and that urinating on Austin's clean laundry was evidence of an escalation towards the subsequent attack. Additionally, because Hill did not take any action to separate Torres and Austin, or to contact a supervisor about their conflict, Hill may have known that Torres would have continued access to Austin until at least Monday morning when his voicemail was received by the NCP Classification Department. Therefore, I find that Austin has demonstrated that issues of material fact exist as to whether Hill had subjective knowledge of a substantial risk to Austin and whether his conduct caused Austin's injuries. I will deny defendants' motion for summary judgment to the extent that it pertains to Hill.

Conversely, Austin has not presented evidence that defendant Lieutenant Kospiah was

aware of a threat to Austin.  Rather, Kospiah's only involvement was as an officer on duty in L

Tier during the fight on May 2 in which Austin implicated Torres.  Dkt. No. 35 at 4.  Austin

contends that Kospiah failed to remove Torres from L Tier after that incident though Austin does

not contradict defendants' assertion that Austin's identification of Torres as involved was

uncorroborated by any other inmate or guard present.  Dkt. No. 35-1 (Austin Dep.) at 22:7-9;

Dkt. No. 35-2 (Brannon Dep.) at 41:8-16.  Therefore, Austin has not presented evidence that

Kospiah had subjective knowledge that Torres regarded Austin as a snitch, that Torres allegedly

urinated on Austin's clean laundry or that Austin feared retribution by Torres for reporting him.

Neither does Austin contend that Kospiah overheard Torres make threatening statements about

Austin.  Therefore, I find that Austin has not presented evidence that Kospiah had the requisite

knowledge to disregard a substantial risk of harm to Austin and I will grant defendants' motion

for summary judgment of Austin's § 1983 claim against defendant Kospiah.

## II.    Qualified Immunity

Having concluded that Austin has identified material disputes of fact that preclude

summary judgment of his § 1983 claims against defendants Brannon and Hill I turn now to the

question of whether they are entitled to qualified immunity.  The qualified immunity question

should be resolved at the earliest moment in litigation in order to "spare a defendant the

unwarranted demands customarily imposed upon those dealing with a long drawn out lawsuit."

Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997), citing Siegert v. Gilley, 500 U.S. 226, 232

(1991).

"Government officials performing discretionary functions are generally shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982). Qualified immunity is "broad in scope and protects 'all but the plainly incompetent or those who knowingly violate the law.'" Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007), citing Couden v. Duffy, 446 F.3d 483, 501 (3d Cir. 2006) (Weis, J., dissenting). To determine whether an officer is entitled to qualified immunity the Court must determine whether the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 194 (2001). "If the facts, when viewed in the light most favorable to the plaintiff, do not show that the officer violated a constitutional right, then plaintiff's § 1983 claim must fail." Curley, 298 F.3d at 277. The Court must also ask whether the right was clearly established at the time the officer acted. Id. I may address these questions in any order. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In order for a right to be clearly established "the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). It is clearly established that prisoners have a constitutional right to be free from violence at the hands of fellow inmates. Farmer, 511 U.S. at 833; see also Kovalchik v. Wagner, No. 08-507, 2010 WL 3810902, at *16 (D.N.J. Sept. 22, 2010) ("[t]here is no question that the Plaintiff's constitutional right not to be physically assaulted while incarcerated was clearly established at the time of [the] attack"). In failure to protect cases prison officials are liable pursuant to § 1983 when a plaintiff has been assaulted by another inmate if there was "intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard on the part of prison officials." Davidson v. O'Lone, 752 F.2d 817, 828 (3d Cir. 1984). Therefore, it was also clearly established at the time of the events alleged that deliberate or reckless disregard for an inmate's right not to be assaulted is a constitutional violation. Williams v. Smith, 507 F. App'x 260, 263 (2012).

"Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." Curley, 298 F.3d at 278. Granting Austin the inferences to which he is entitled, I find that a reasonable jury could conclude that defendant Officers Brannon and Hill acted with deliberate or reckless indifference to Austin's safety. If, as Austin's evidence suggests, defendants had actual, subjective knowledge that Torres regarded Austin as a snitch and intended to retaliate against him by stabbing him, defendants would have violated Austin's clearly established constitutional rights by failing to take effective steps to separate him from Torres. Therefore, the qualified immunity defense does not warrant summary judgment on Austin's claims against Brannon and Hill.

In order to determine whether defendants Brannon and Hill acted reasonably there must be findings of fact as to their knowledge of a substantial risk of harm to Austin at the time of the attack. Id. at 278. I may determine the issue of whether the defendant officers acted with objective reasonableness once the historical facts are no longer in dispute. "A judge may use special jury interrogatories, for instance to permit the jury to resolve the disputed facts upon which the [C]ourt can then determine, as a matter of law, the ultimate question of qualified immunity." Id. at 279. Because there are material issues of fact regarding the extent of defendants' knowledge of the risk to Austin prior to the attack, I will withhold judgment on the reasonableness of defendants' conduct until after the jury resolves these disputes.

III.   **Monell Liability**

Austin opposes defendants' motion for summary judgment of his Monell claim and contends that NCP's customs or practices of housing protective custody inmates alongside

administrative custody inmates on L Tier and of allowing inmates on L Tier unrestrained access to disposable razors support his Monell claim.  Dkt. No. 35 at 26-30.

In order to prevail on his claim of municipal liability against Northampton County Austin must demonstrate that a policy, practice or custom of NCP caused the constitutional injury he claims.  Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403-04 (1997).  A course of conduct within a government entity can constitute an actionable custom when the conduct is longstanding and well established.  Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).  Additionally, custom "may be established by evidence of knowledge and acquiescence." Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989).  The decisionmaker need not be "specifically identified by the plaintiff's evidence" and "[p]ractices so permanent and well settled as to have the force of law [are] ascribable to municipal decisionmakers."  Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (additional citations omitted).

 In addition to identifying an unlawful policy, custom or practice, Austin must demonstrate a "plausible nexus" or "affirmative link" between NCP conduct and his specific injury.  See City of Okla. City v. Tuttle, 471 U.S. 808, 823 (1985).  Finally, Austin must show that the municipality acted deliberately and was the "moving force" behind the claimed constitutional deprivation.  Bd. of Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 404-05. Establishing that policymakers either deliberately chose not to pursue alternative practices or preventive measures or acquiesced in a longstanding policy or custom of inaction will satisfy this burden.  Simmons v. City of Phila., 947 F.2d 1042, 1064 (3d Cir. 1991).

Austin may establish deliberate indifference by showing that NCP had actual or constructive notice that its action was substantially likely to result in a constitutional violation and that it consciously disregarded the risk of harm.  Bd. of Cnty. Comm'rs of Bryan Cnty., 520

U.S. at 407.  Deliberate indifference may also be found in circumstances where violation of a

constitutional right is a "highly predictable" or "plainly obvious" consequence of a

municipality's action or inaction.  Id. at 409 (identifying failure-to-train cases as one context for

this analysis).  "The high degree of predictability may also support an inference of causation –

that the municipality's indifference led directly to the very consequence that was so predictable."

Id. at 409-10.   Austin identifies two potential bases for his Monell claim.  I will evaluate each

according to this standard.  Dkt. No. 35 at 26-27.

### A. L Tier Housing

Austin contends that NCP's custom or practice of housing protective custody inmates

alongside administrative custody inmates on L Tier proximately caused his injuries.  Dkt. No. 35

at 27.  This is not an improper classification case.  Plaintiff concedes that he was properly

classified as a protective custody inmate and Torres was properly classified as an administrative

custody inmate.  He contends, however, that their physical proximity and access to each other on

L Tier is the result of unconstitutional municipal custom or practice.

The NCP classification policy is based on an inmate behavioral management model

which evaluates the risk an inmate poses to prison officials and other inmates.  Dkt. No. 35-3

(Buskirk Dep.) at 21:18-22.  An inmate is placed in protective custody for "protection from some

other entity or force within the jail that's looking to harm them . . . [protection from other

inmates.]"  Id. at 23:16-24.  Protective custody inmates are housed on L Tier at NCP.  Id. at

36:20-22.  Administrative custody inmates are also held on L Tier.  Id. at 36:1-11.

Administrative custody inmates are those considered to be a risk to staff or other inmates.  Id. at

24:7-11 ("[t]here are some individuals that as we say in the business do not play well with others.

And so we have to segregate them from the general population").

In deposition testimony Warden Buskirk described the longstanding practice at NCP of housing protective custody and administrative custody inmates together on L Tier.  Id. at 27. Buskirk stated that the housing arrangement on L Tier was not unusual because "there is no other spot for them in the institution, L tier was kind of a fallout."  Dkt. No. 35-3 (Buskirk Dep.) at 35:16-18.  Buskirk further elaborated on NCP's use of L Tier, stating "[L Tier] is a special needs, protective custody, juvenile housing.  It's wherever someone doesn't fit into another category within the general population . . . they end up on L Tier."  Id. at 78:9-21.   Warden Buskirk's deposition testimony about the nature and purpose of the prison classification system illustrates the common understanding that certain inmates pose a heightened risk to their fellow inmates and that other inmates are especially vulnerable to attack in the prison setting.  Id. at 21:13-24:23.  I find that a material question of fact exists as to whether the practice or custom of housing these two types of inmates together creates an obvious risk of substantial harm to the latter group.

NCP classified Austin as a protective custody inmate because he was accused of a crime against a child.  Dkt. No. 34 at 3; Dkt. No. 35-3 (Buskirk Dep.) 53:23-54:11 ("In the hierarchy of institutions, sex offenders with children do not rank very high, and they generally need to be separated from the general population").  NCP classified Torres as an administrative custody inmate because he was convicted of a violent crime, he was gang affiliated and considered to be unpredictable and a potential threat to others.  Dkt. No. 35-3 (Kospiah Dep.) at 32:15-24; 39:17-21; Dkt. No. 35-3 (Buskirk Dep.) at 54:12-22.  I find that a reasonable jury could conclude that NCP recognized the necessity of protecting inmates like Austin from inmates like Torres, and that the NCP custom or practice of housing both protective and administrative custody inmates on L Tier where they would have unfettered access to each other during meals and recreation and

in the common areas on L Tier constitutes an unconstitutional custom or practice.  Dkt. No. 34

(Buskirk Dep.) at 49:1-18 (explaining formal process for separating two inmates on the same cell

block); see also Dkt. No. 35-2 (Brannon Dep) at 103:7-18 (explaining on the day that Austin was

attacked Torres and Austin were both in the same common area and that neither was locked in

his cell); 104:3-105:12 (explaining that Torres and Austin had access to the same card tables in

the common area of L Tier).

A reasonable jury could also find that NCP's practice of housing both protective custody

inmates and administrative custody inmates on L Tier was the decision of a NCP policymaker or

the result of acquiescence.  I find that Austin need not demonstrate that any NCP official had

actual or constructive knowledge that such practice carried potential danger to Austin because a

jury could find that the potential danger of housing at-risk inmates alongside high-risk inmates is

highly predictable and plainly obvious.  Warden Buskirk's acknowledgement of this practice

constitutes acquiescence to the housing arrangement on L Tier despite the obvious risks.

In order to state a viable Monell claim Austin must also demonstrate that NCP's custom

or practice of housing administrative and protective custody inmates together on L Tier was the

moving force behind the deprivation and that his injury was caused by that practice or custom.

Bd. of Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 404-05.  I find that if Torres testifies at trial

and the jury believes he attacked Austin because of the nature of the charges against Austin, the

jury could reasonably conclude that Torres' statements demonstrate an affirmative link between

the NCP policy granting him proximity and access to Austin and his attack of Austin.[6]  In the

---

[6]     The statements attributed to Torres in Fuls' incident report and in Botteri's deposition
testimony evidence Torres' motivation for attacking Austin.  However, it is unclear whether they
are admissible evidence.  Botteri's deposition testimony conveys the statements of another and
therefore is only admissible if an exception to the hearsay rule applies.  Fed. R. Evid. 801, 802.
Potentially Botteri's testimony about Torres' statements is admissible pursuant to the statement

17

incident report, Fuls alleges that Torres stated that he "had enough" of Austin talking about the offense for which he was incarcerated at NCP and decided to attack Austin because he "was already facing life in prison and possibly the death penalty" so, "why not[?]".  Dkt. No. 34 at 69. Similarly, Botteri states that "[Torres] had a problem with Mr. Austin due to the nature of Mr. Austin's charges . . ."  Dkt. No. 35-3 (Botteri Dep.) at 16:10-24.

Austin has presented evidence that NCP properly classified him as in need of protection from other inmates because he was accused of committing heinous crimes against children.  See e.g., Dkt. No. 35-3 (Buskirk Dep.) at 54:7-11.  Austin has also presented evidence that NCP properly classified Torres as in need of supervision and separation from the general population because he was violent, unpredictable and had little incentive to comport himself with good behavior.  I find that a jury could conclude that NCP recognized that Austin was the type of inmate most in need of protection from other inmates, and that inmates like Torres were most likely to pose a risk of harm to inmates like Austin who were accused of heinous or abhorrent crimes against children.  If a jury concluded that Torres attacked Austin for the very reason that NCP classified Austin as a protective custody inmate, it could reasonably conclude that the NCP practice or custom of housing them alongside each other was the moving force behind the attack because that practice exposed a vulnerable class of inmates to risk of harm from the most dangerous population of the prison.  A jury could find that Torres would have had neither the motive nor the opportunity to attack Torres but for the NCP custom or practice of housing them

---

against interest exception to the hearsay rule.  Id. at 804(b)(3).  However, I need not decide this issue at this stage.  Similarly, while the incident reports authored by Fuls and Botteri convey statements attributed to Torres, they are not authored by him, nor have they been adopted by him. I recognize that these reports may be admissible as business records.  Id. at 803(6).  For all of these reasons, I acknowledge that Austin may be able to present evidence to a jury that Torres attacked Austin because of the nature of the charges against Austin.  Again, I need not decide that issue now.  Therefore, I find that a material issue of fact exists as to Torres' motivation for attacking Austin.

together on L Tier.

A material question of fact exists as to Torres' motivation for attacking Austin.  If Austin was attacked because Torres was offended by the nature of the crime of which Austin was accused, a reasonable jury could conclude that the moving force behind the attack on Austin was the NCP custom or practice of housing at risk inmates like Austin alongside potentially violent and unpredictable inmates like Torres.  I will deny defendant's motion for summary judgment with respect to plaintiff's <u>Monell</u> claim based on the NCP custom or practice of housing both protective and administrative custody inmates on L Tier.

### B.      Access to Razor blades

Though the parties agree that NCP had a policy in place governing the distribution of razor blades, Austin contends that NCP's practice or custom of permitting L Tier inmates to have unlimited access to disposable razors without tracking their distribution or limiting their number resulted in Austin's slashing.  Dkt. No. 35 at 28-29.  Austin points to Warden Buskirk's testimony that officers often found razors that inmates had modified during cell searches, and Lieutenant Botteri's testimony that slashings with razor blades eventually caused the prison to change its policy on razor blades.  Dkt. No. 35-3 (Buskirk Dep.) at 61:21; Dkt. No. 35-3 (Botteri Dep.) at 43:10-12.  Austin argues that this evidence "shows that the Warden and Northampton County knew about the dangers their L-Tier classifications and razor blade practices posed, but recklessly disregarded those risks."  Dkt. No. 35 at 30.

Conversely, defendants contend that "the razors utilized by the NCP were specifically designed, manufactured, and marketed for use in prisons because they are more difficult for inmate[s] to convert into weapons."  Dkt. No. 34 at 29.  Additionally, defendants present evidence that NCP employees conducted regular searches for weapons in the facility and that

NCP availed itself of available technology to locate and remove inmate weapons.  Id. at 30; Dkt.

No. 35-3 (Buskirk Dep.) at 62:5-63:7.  Austin does not contradict either assertion.  Though

Austin points to one other slashing with a razor that occurred in NCP before he was attacked he

does not present evidence that NCP officials were aware of a pervasive problem with abuse and

modification of razor blades amounting to a substantial risk of harm to the inmates prior to the

May 3, 2009 attack.  Neither has Austin produced direct evidence that deficiencies in the NCP

razor blade policy were plainly obvious or highly likely to result in constitutional violations.  I

find that even if the NCP razor blade policy could have been improved it was not constitutionally

deficient.

   Even if the razor blade policy was constitutionally deficient, Austin has failed to satisfy

the causation element of this Monell claim.  Because he must show that the allegedly defective

policy or custom was the moving force behind the violation of his rights Austin must present

evidence that alternatives for preventing inmate slashings with modified razor blades were

known and available to NCP but that NCP either deliberately chose not to pursue them or

acquiesced in a longstanding policy of inaction.  Eichelman v. Lancaster Cnty., 510 F. Supp. 2d

377, 396 (E.D. Pa. 2007).  Austin has not shown that NCP's razor blade policy, rather than the

conduct of individuals, was the moving force behind his injury.

   As many courts have noted, violence in prisons is common, and to a certain extent,

unavoidable.  See e.g., Riley v. Jeffes, 777 F.2d 143, 145 (3d Cir. 1985), quoting Marchesani v.

McCune, 531 F.2d 459 462 (10th Cir.) ("Prison setting is, at best, sometimes explosive, and

always potentially dangerous.").  Though it may be "tragically unwise . . . to allow inmates

access to razor blades" prisons have been given the discretion to determine the policies and

procedures for safeguarding prisoners.  Redmond v. U.S., No. 04-231, 2006 WL 709347, at *4

(M.D. Pa. Mar. 20, 2006) (additional citations omitted).  NCP had a policy in place to prevent and mitigate the risk of violence resulting from inmate access to razor blades.  Dkt. No. 34 at 29. I find that NCP's policy governing the type of razor blades available to inmates and the searches for modified or stockpiled razor blades that prison officials must conduct are evidence against NCP's deliberate indifference to the risk of harm posed by inmate access to razor blades. Though Austin argues that NCP's policy could have been more expansive or effective in preventing inmate assaults with razor blades he has provided no evidence of an unconstitutional policy, practice or custom which was the moving force behind the attack on him, or NCP's deliberate indifference to a substantial risk of harm to inmate safety.  Therefore, Austin's claim that the NCP policy regarding the distribution of razor blades was inadequate to prevent Torres from converting a razor blade into a weapon and using it to slash him is not sufficient to withstand defendant's motion for summary judgment and I will grant defendant's motion on this claim.

## IV.     State Law Claims

Having concluded that several of plaintiff's federal claims survive summary judgment I turn now to plaintiff's state law claims.  For the reasons that follow I will enter judgment against plaintiff on his claims for intentional infliction of emotional distress and aiding and abetting.

### A.       Intentional Infliction of Emotional Distress

Under Pennsylvania law "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . ." Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998).  This is a notoriously high standard and cases which have found a sufficient basis for the cause of action have presented only the most egregious conduct.

> [C]ourts have been chary to allow recovery for a claim of
> intentional infliction of emotional distress.  Only if conduct which
> is extreme or clearly outrageous is established will a claim be
> proven.  Indeed, our Superior Court has noted '[t]he conduct must
> be so outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency, and to be regarded as
> atrocious and utterly intolerably in civilized society.'

Id. at 151, citing Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (1987).

Additionally, "[a]lthough the outrageousness of a defendant's conduct is ordinarily a question for

the trier of fact the [C]ourt may decide as a preliminary matter whether defendant's conduct is

sufficiently extreme to permit recovery."  Abdullah v. Phila. Hous. Auth., No. 99-2309, 2000

WL 377796, at *7.  Finally, in Pennsylvania a claim for intentional infliction of emotional

distress must be supported by competent medical evidence of the alleged mental injury.  See e.g.,

Estevez v. City of Phila., No. 06-316, 2007 WL 707358, at *9 (E.D. Pa. Mar. 2, 2007); Simril v.

Twp. of Warwick, No. 00-5668, 2003 WL 1204104, at *2, (E.D. Pa. Mar. 18, 2003).  Absent

such evidence plaintiff fails to establish a prima facie case of emotional distress.  Wnek v. City

of Phila., No. 05-3065, 2007 WL 1410361 (E.D. Pa. May 10, 2007); Jackson v. Paparo, No. 00-

3413, 2002 WL 32341800, at *11 (E.D. Pa. Oct. 28, 2002).

Austin contends that defendants Hill and Brannon intentionally or recklessly caused  him

to suffer severe emotional distress by failing to separate Austin and Torres, allowing Torres to

urinate on Austin's clothing and allowing Torres to "repeatedly threaten the health and safety of

[Austin] and [Austin's] family."  Dkt. No. 34 at 34.  However, nowhere in Austin's pleadings

has he provided medical evidence, competent or otherwise, of an alleged mental injury.

Therefore, regardless of whether this conduct rises to the level of outrageousness, Austin has

failed to make out a prima facie case of emotional distress.  Accordingly, I will grant summary

judgment on Austin's claim for intentional infliction of emotional distress.

**B.      Aiding and Abetting Claims**

Pennsylvania recognizes the tort of aiding and abetting pursuant to § 876 of the Restatement (Second) of Torts, Persons Acting in Concert.  Skipworth by Williams v. Lead Indust. Assoc. Inc., 690 A.2d 169 (1997).   A person is subject to liability for harm to a third person arising from the tortious conduct of another if he:

    a)   does a tortious act in concert with the other or pursuant to a common design with him, or

    b)   knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so as to conduct himself, or

    c)   gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person

Restatement (Second) of Torts § 876 (1979).  Therefore, "liability for aiding and abetting requires proof of three elements: underlying tortious conduct, knowledge, and substantial assistance."  Jenkins v. Williams, No. 02-331, 2008 WL 1987268, at *14 (D. Del. May 7, 2008).  Importantly, "with regard to this second element, mere knowledge is insufficient.  The knowledge element must be coupled with some degree of intent.  Additionally, there must be a linkage of knowledge to the third element of liability, that is, providing substantial assistance."  Id. at 14.  Finally, plaintiff must establish the completion of the underlying tort in order to establish a prima facie case for a claim of aiding and abetting that tort.  Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc., 187 F. Supp. 2d 400, 412 (W.D. Pa. 2002) ("The plain language of § 876(a) indicates that a concert of action claim will lie only if both persons who are alleged to have acted in concert each committed a tortious act.").  Austin has asserted claims of aiding and abetting intentional infliction of emotional distress, aiding and abetting assault and aiding and abetting battery against defendants Brannon and Hill.  Dkt. No. 35 at 29-30.  I will address each in turn.

### 1.      Aiding and Abetting Intentional Infliction of Emotional Distress

Austin contends that defendants Brannon and Hill "knowingly and/or intentionally provided substantial assistance to Torres' outrageous and tortious conduct, which caused severe physical and emotional distress to Plaintiff" by failing to separate Torres and Austin, failing to properly classify, house and supervise Torres and by failing to respond to the assault.  Dkt. No. 23 at ¶ 141; 144.  However, because I have found that Austin failed to establish a prima facie case for intentional infliction of emotional distress, I will also grant summary judgment on his claim of aiding and abetting intentional infliction of emotional distress.  See e.g., First United Bank & Trust v. PNC Fin. Serv. Grp., Inc., 667 F. Supp. 2d. 443, 457 (M.D. Pa. 2009).

### 2.      Aiding and Abetting Assault

Austin contends that defendants Brannon and Hill substantially assisted Torres in assaulting Austin by failing to separate Torres and Austin, improperly classifying, housing and supervising Torres, and failing to timely respond to the attack.  Dkt. No. 23 at ¶ 151.  However, nowhere in plaintiff's original or amended complaint does Austin make a claim for assault.  Because there can be no claim for aiding and abetting unless plaintiff has also alleged a viable claim for the underlying tort, I will enter judgment against Austin on Austin's claim that defendants Brannon and Hill acted in concert with Torres to commit the assault against him.  See First United Bank, 667 F. Supp. 2d. at 458 (dismissing aiding and abetting claim against defendant because plaintiff failed to bring a claim for the underlying tort in the complaint).

Even if Austin had brought a claim for assault in his complaint this claim would still fail as a matter of law because Austin has not demonstrated that defendants Brannon and Hill substantially assisted the completion of the underlying tort – the slashing perpetrated by inmate Torres.  I have concluded that there are material questions of fact as to whether Brannon and/or

Hill were deliberately indifferent to a substantial risk of harm to Austin, specifically, that a jury could conclude the defendant officers had subjective knowledge of Torres' intention to attack Austin and were therefore unreasonable in their failure to separate them.  However, that conclusion falls short of an affirmative finding on the second element of an aiding abetting claim: that defendants substantially assisted Torres in completing the attack.

In determining whether a defendant's assistance is substantial enough to render him liable for the tort of another the Court of Appeals has looked to the Restatement of Torts § 436.  Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 163 (3d Cir. 1973).  The relevant factors are "(1) the amount of assistance given by the defendant; (2) his presence or absence at the time of the tort; (3) his relation to the other person; and (4) his state of mind."  Id. at 163.  The Landy court concluded that there could be no liability for aiding and abetting where the defendants' participation was "necessary for the accomplishment of [the tort]" when it was not intended to achieve a tortious goal.  Id. at 163.

In this case, defendant Brannon participated in the slashing only to the extent that he failed to separate Austin and Torres after allegedly learning that Torres intended to harm him.  However, Austin has presented no evidence that Brannon granted Torres improper access to Austin.  Similarly, though Brannon was present on L Tier when Austin was attacked, Austin has not demonstrated that Brannon's proximity to the attack was such that he could have prevented it or intervened sooner.  Neither has Austin demonstrated that Brannon has any special relationship to inmate Torres.  Finally, Austin has not presented any evidence that Brannon possessed a culpable state of mind or any indication that Brannon intended for Torres to attack Austin.  Therefore, I find that Austin has not established that Brannon substantially assisted Torres in assaulting Austin.

Defendant Hill also failed to separate Austin and Torres but, as with defendant Brannon, Austin has not presented evidence that Hill granted Torres improper or illegal access to Austin. Additionally, defendant Hill was not present at the time of the attack, and Austin has not demonstrated that Hill's participation in the events of May 2, 2009 was designed to give Torres improper access to Austin. Therefore, I find that Austin has also not established that Hill substantially assisted Torres in assaulting Austin. Therefore, Austin has not established a prima facie case against defendants for aiding and abetting assault and I will enter summary judgment in defendants' favor on this claim.

### 3.       Aiding and Abetting Battery

Austin also failed to claim aiding and abetting battery in his complaint. Therefore, I will enter judgment against Austin on this claim as well.

Additionally, as discussed above, even if Austin had claimed aiding and abetting battery in his original or amended complaint, this claim would still fail as a matter of law because he has not demonstrated that defendants Brannon and Hill substantially assisted Torres in completing a battery. I find that Austin has failed to establish substantial assistance in this claim for the same reasons explained above in my analysis of defendants Brannon and Hill's participation in the events of May 2, 2009 and May 3, 2009 regarding Austin's claim of aiding and abetting assault.

An appropriate Order follows.